Please be seated. Mr. Clerk, will you call the next case, please? 3-12-086077 Illinois, LLC v. Gaming & Entertainment Management-Illinois, LLC Thank you. And Mr. Riffle. Good afternoon, Your Honor. Good afternoon. Did I pronounce that right? Riffle, Your Honor. Yes. Robert Riffle, Your Honor. On behalf of Triple Southern Illinois, LLC, with me today is Lane Alster, my associate. I'm going to please the court, counsel. Good afternoon. What we have today is a, first of all, a case of first impression for this court, arising under the relatively recently enacted and much more recently implemented Illinois Video Gaming Act. I believe every aspect of this case today is subject to de novo review, and the stakes in this matter, we think, are very high for not only the parties, but for the state of Illinois. And I think this case really impacts the integrity of gaming in the state of Illinois. Our position is that, consistent with the statutory and regulatory scheme, only licensed entities can participate in and profit from gaming in Illinois. What the defendants in this case are urging is directly the contrary, that essentially a very large aspect of the licensing process can be circumvented by non-licensed entities entering into contracts to place and operate video gaming terminals and establishments, and then sell them like they're baseball trading cards from unlicensed entity to unlicensed entity to denied entities that are found unsuitable, as long as they ultimately end up in the hands of a licensed terminal operator. That is fraught with potential for abuse, is fraught with the possibility that really unsavory people end up being the ones that profit from gaming in the state of Illinois. The Illinois Gaming Board has denied licensure to quite a number of applicants who have stepped up to the plate and said, I want a license to participate in this privileged industry. Many of those entities have gone on to simply sell these what are now being called precursor agreements to licensed entities, despite the fact that they've been found unsuitable to participate in this industry. Some of these entities have very bad backgrounds. The IGB has said, you are unsuitable, we are not going to license you. And yet, the next day, these companies are turning around, selling these contracts at great profit. In this case, the facts in this case, is it correct that 777 negotiated his contract with DeLee? Yes. Right? And there was knowledge there was a Metro contract. I believe that's probably true, Your Honor. But 777 allegedly told DeLee that Metro's contract was invalid. Well, I think that's been alleged. I'm not sure. And so, now DeLee right now, but in part of this time, DeLee was not a license either. Yeah, they were relatively recent. So they just recently got their license. That's correct. And that would now transfer everything into use contracts, I guess, right? We think not, Your Honor, because the definition of a use agreement is a contract between a licensed terminal operator and a licensed video gaming location. That's under Section 1800.110 of the Illinois Administrative Code. Subsection E of Section 25 of the Illinois Video Gaming Act says that an establishment can't have VGTs unless it has entered into a written use agreement with the terminal operator. Terminal operator is defined as a licensed entity. So what we're saying is all of these documents that people went around and signed at a time they weren't licensed as a terminal operator are really a nullity. Call them a use agreement. Call them whatever you want. They're just a scrap of paper because there is no right to go out and sign these people up. I don't have that right to go out on the street on my way home today. Well, the terminal installation agreements are not the same as use agreements, are they? Well, they can be one and the same thing. A licensed operator can go out and sign up an establishment under an agreement to place and operate video gaming terminals. This term precursor agreement is just a made-up term. It's not found in the statute or the regulations. What people have said is even though the statute says you've got to be licensed and you can't assign an agreement except from a licensed entity to a licensed entity, we're going to butt an end around that statutory scheme by saying you can enter into precursor agreements. Again, the statute doesn't have that word in it. But the statute says a use agreement is only an agreement that's between a licensed and a licensed entity. Right. Two licensed entities. Absolutely. Okay, and so through all this until recently, the LEA wasn't a licensed entity. True. And so it wouldn't be under that definition of a use agreement. But the distinction there, Your Honor, is that now the 777 agreement is between a licensed entity and another licensed entity. But the metro placement agreement is not. It's between an unlicensed entity that was transferred to another unlicensed entity who's not only unlicensed but denied a license, and then ultimately into the hands of a third party. It eviscerates the statutory scheme. Only 777 was licensed, right? I mean, not the entity. I don't know why that analogy works or comparison works. Well, 777 is not licensed. GEM was licensed. Right, but GEM never entered into an agreement with the LEA. And I understand you're saying it's the assignment itself that had no validity. Right. Well, an interesting argument then arises, can anybody enter into the agreement, in other words, is 777's agreement valid under those circumstances? Our position is yes, because now it's licensed and deleases, but it's quite possible that you could say neither would be, I'm not saying that 777 or somebody else has to go out there and re-sign these contracts, license to license. I don't think that's really the case, and I don't think that's necessarily the case that has to be ruled on in this case, because you have a licensed entity and a licensed entity now. After the most recent. Right, so that kind of begs the question, if metro had gone ahead and gotten licensed, arguably that could be a valid agreement at some time. Also, you've been making a policy argument about this shouldn't be and this could lead to all kinds of mischief. Those aren't your words, but I mean. Right. But there's nothing in the Act and its associated regulations that prohibit pre-licensure agreements, is there? No. There's nothing in the Act that prohibits that. Sure, sure, because. I mean, there's nothing that prohibits what happened in this case. I respectfully disagree, Your Honor, because you start with a proposition under the Illinois Gambling Act that you can't gamble in the state of Illinois in the absence of these very narrow circumstances. So the presumption starts with nobody can go out and enter into contracts for gaming other than as expressly allowed. So the presumption doesn't start with anybody can sign contracts for gaming. I've heard them called garden variety or precursor agreements. That would be like me going out and saying I'm going to enter into a contract to sell a controlled substance or I'm going to go do something else that requires licensure with no intention of doing that and then trying to sell it to somebody who does have that license. As a regulated industry, the licensure is the starting point. And the legislature and the IGB tried their best to make this clear. They say that a use agreement has to be between a licensed terminal operator and a licensed video gaming location, and I think that's very clear, between two licensed entities. And then they go further. That's the statute. Then the regulation, only be between a licensed terminal operator and a licensed establishment. And here is the most important part. Prohibit any assignment other than from a licensed terminal operator to another licensed terminal operator. It couldn't have been the legislature's intent to put those provisions in there and then say, oh, by the way, that doesn't really matter. It's anybody. Well, when all of this was going on below, the contract between Metro and the contract between Triple 7, neither one of them were use agreements with because the lead wasn't a licensed establishment. That, Your Honor, I would agree with. Neither of them at that point met that definition. So they weren't use agreements. Right. I would agree. I think you have two things there. You have one document that wasn't a use agreement and never could possibly become a use agreement because Metro never even applied to be licensed, and Subsection D prohibits any assignment, whereas the Triple 7 one arguably could become a use agreement because DeLease now is licensed and Triple 7 is now licensed. You have both parties? I'm sorry. You have both parties now to that, and it is now technically a contract between a licensed entity and another licensed entity. But an assignment, a contract could be assigned, no? Well, most... And wasn't this contract assigned by VEST prior to their being turned down as a licensed operator? Well, no. They were turned down. Then they sold it two days before the denial of their appeal. So the argument's been made, well, you're still an applicant at that time, but the fact you're still an applicant really I think is irrelevant because you weren't a licensee. You had no right to assign this under the carefully crafted regulatory scheme. And using that analogy, though, it would be a fair analogy when she says that there should be no precursor agreements, that there's a licensed entity that you can't enter into an agreement with an unlicensed entity even knowing that they've applied or that they intend to. Your Honor, I do think a good argument could be made in that regard. Our real point is that the Metro placement agreement isn't valid and that Triple 7 has the right to approach that establishment. Whether they had the right to do it early or only after the licensure I think is a fairly debatable point. I think because now they're both licensed, I think it does arise to the level of a use agreement, whereas the Metro one, because Metro never applied, BEST was denied, that document, I agree, it's not a use agreement. It's an invalid illegal scrap of paper. It has no validity. And the problem is if the contrary is the case, it would encourage everything to be done in an unregulated manner. There's no regulation or there's nothing in the act or the regulations that say what you just said, that it's illegal. Well, the Illinois Gaming Act, the Illinois Gambling Act starts with the proposition that all contracts except for these very few accepted are illegal. It's illegal to enter into a contract for any gaming operation other than is expressly allowed by the statute. So the presumption starts with everything's illegal unless it's expressly allowed for as opposed to the other way around. That's just a made up term, Your Honor. There is no statutory definition of that. It's not in the regulations. People are just in this arena where they're saying, wait a minute, we want to do all this on an unregulated side. What would keep BEST that's now been denied a license, what would keep Metro from continuing to go out and sign up people even though one of them has been found unsuitable, the other has never even applied for a license, what keeps them from continuing for years to come to go sign people up? You can't operate until you follow the act, so you can't operate. Can't operate, but you could sell them to JEM or to... Well, they can't now because they've been turned down. Well, what would, under the defendant's argument, what would keep BEST from going out and signing up locations? Because all they're saying is anybody can sign. That would be a precursor agreement under their definition. BEST could go out, sign up 50 more customers, sell them to JEM, because they're saying all of this done by unlicensed entities is beyond the reach of the IGB. They just have the right to go out there and do whatever they want as long as it ends up in the hands of ultimately a licensed entity. That mischief that could be caused, convicted felons, terrible people, people with mafia ties or whatever could go out and accumulate these agreements and sell them to the highest bidder, and under their theory, that is an entirely unregulated activity. Why would the legislature go through the trouble of saying it prohibits assignment other than from a licensed operator to another licensed operator if they thought that it was going to be okay for this kind of unsavory... Because the legislature could correct this by being very definite about these other... adopting an act, saying what you're saying. But, Your Honor, I think they actually do. It says prohibit any assignment other than from a licensed operator to another licensed operator. And elsewhere they say it can only be a contract between a licensed entity and a licensed entity. I think that's what they tried to do. Those are the use agreements. They are use agreements. They are use agreements, but there is no other real agreement. You can't even have a different agreement for the placement and operation of video games. I can't enter into a contract to have a poker game at my house because it violates the Gambling Act. These are illegal documents. They've very creatively, in a very sophisticated manner, tried to find a way to conduct all of this activity outside the realm of the regulations. People who are denied, the next day they're out there selling them to the highest bidder. We think that, for those reasons, the agreements cannot be valid. They sign and respectfully request reversal. Thank you. Thank you, Mr. Ruffin. And Ms. Ramsey? Oh, I'm sorry. Thank you, Your Honor. Ms. Ramsey would not have the first name of Douglas. Douglas Fott, apologies. To both of you. Thank you, Your Honor. I guess I'd like to pick up on a couple of issues discussed with Mr. Riffle, and I think the panel adequately picked up on a very important point, which is that there is a fundamental inconsistency in the position that 777 has advanced to this court. They, on the one hand, want you to believe that their agreement, which was, in fact, a pre-licensure agreement because one of the entities, Deliz, was not licensed, is still nonetheless valid, while at the same time challenging our agreement and claiming that our agreement is invalid because it was also entered into pre-licensure. Respectfully, you cannot reconcile those two positions, and I think the distinction that Mr. Riffle is trying to draw is that, in his instance, the terminal operator was licensed and the location was not licensed, and that that somehow had an impact on the analysis. Well, it really doesn't. It's either a use agreement and subject to the minimum standards that are in Rule 320, or it's not a use agreement. And if it is a use agreement, then the fact that one or both of the parties is licensed, or I'm sorry, is unlicensed, doesn't change the analysis at all. And I think that that fundamental point really undercuts the argument that 777 is asking this court to buy into, which is that their agreement is any different than ours. I mean, I think fundamentally the conduct of 777 acknowledges explicitly that pre-licensure agreements are okay and that they're acceptable, although I will pick up on Justice O'Brien. You asked him whether pre-cursor agreements would be valid in any instance, and he responded somewhat curiously that they wouldn't be, which, of course, would undercut the 777 agreement, which is the agreement that they're claiming provides them standing to come into this court and challenge our agreement with the location. So we heard a couple of different things from Mr. Riffle, all of which undercut their argument, and none of which is consistent with the Video Gaming Act or with the way that the Illinois Gaming Board has implemented the Gaming Act. We've talked in our brief about there really being sort of two agreements, and those agreements are really the same type of agreement. They're just called something a pre-licensure agreement before the parties are licensed, and they elevate to a use agreement at such time as both parties become licensed under the Act. The Act specifically defines use agreement as only being between licensed parties. The Illinois Gaming Board, however, has a process for terminal operator applicants, which says, as part of your application, we want you to identify those parties with which you have an agreement to place the video gaming terminals. We want you to provide us with those video gaming terminal operating agreements, and we want you to provide us with your form agreements. And this, of course, is acknowledgement that this is a terminal operator applicant, so this is all occurring pre-licensure. These other agreements are pre-licensure agreements? All pre-licensure agreements, by their very nature, right, because the terminal operator at that point is an applicant. It's not a licensed terminal operator. So by their very nature, they are pre-licensure agreements, which the Illinois Gaming Board is requesting from all applicants who apply for terminal operator license. In their brief, 777 says, you know, judges, we want you to sort of ignore that practice, even though it's been going on for, you know, since 2010, which is when the terminal operator applications were first available. We want you to ignore that practice of the Gaming Board. That's not the rule of law. That's not the authority. I disagree with that position, in fact, because it's a reflection of how the Gaming Board, which is charged with implementing and administering the Video Gaming Act, it's a reflection of what their view is of pre-licensure agreements, of use agreements, how those things differ, and the legality, in fact, of pre-licensure agreements. Certainly, and so as the administrative agency that is principally responsible for administering the act, this court and all other courts are required to give that decision substantial deference in determining the legality in this case. Well, what about your opponent's argument that interpreting it that way would allow very bad people to be involved in gaming, which is contrary to the whole policy behind the act, and just do all this pre-licensure stuff, knowing full well they'll never be able to get a license, but they'll sew up the business, so to speak, before and just sell it to someone after they've already controlled most of the business right through pre-licensure? And let's be very clear that in situations like that, there is not a single video gaming terminal that will be installed at any location in the state of Illinois by someone who is unlicensed or in an unlicensed location. So you'll still have licensed video gaming terminals being installed at licensed establishment pursuant to use agreements that comply with the minimal standards of the act. And so really in that instance, you will have precisely what the Video Gaming Act contemplates, which is licensed and legalized gaming pursuant to the regulations that the act has set forth and the rules of the Illinois Gaming Board. As far as these unsavory characters benefiting from this type of practice, I guess I want to challenge the predicate of that. I mean, there's sort of assumption that just because a company has denied a license application that it's an unsavory character, that's not necessarily true. There are lots of innocent reasons that happens, but putting that aside, the regulations don't prohibit these entities who have really just engaged in startup activity, which is what we really want to encourage businesses to do in emerging markets. We want to encourage them to engage in these startup activities so that you can launch your video game business sort of efficiently and effectively for purposes of satisfying the act, which is really to generate revenue for the state and for local municipalities. And so they may be benefiting from those initial startup activities where they've entered into precursor or pre-licensure agreements and then for whatever reason have decided to sell those to someone who can engage in video gaming. If it is an issue, and it's certainly not an issue that's prohibited by the Illinois Gaming, by the Video Gaming Act or by any rule or regulation that has been passed by the Gaming Board, if it is an issue, I think, you know, Justice, I'll pick up on an initial sort of thought of yours, which I think is really an issue that really is either left for the legislature or left for the Illinois Gaming Board to sort out. They haven't done that. They certainly haven't passed a rule or regulation that prohibits these types of agreements from happening. They're certainly aware of it. In our record, in fact, we have from the transaction from Vest to Gem, which my firm handled on behalf of Gem, we informed the Illinois Gaming Board of the transaction, provided the Gaming Board with the transaction documents. The Gaming Board was specifically aware of what was occurring. They're also aware at that time of the decision concerning Vest's license for application. The Gaming Board had an opportunity to tell us that, you know, we don't like this type of agreement or that we don't support this type of agreement. The Gaming Board did not do that. And this type of transaction is actually very common and very unique in Illinois. And so you would expect if the Gaming Board had a problem with it that they would pass some type of regulation stopping it or blocking it. They're certainly aware of it. The Gaming Board has not done that. They also didn't. I mean, the legislation, which obviously was negotiated and debated session after session before it became law, didn't allow for it either. I mean, certainly if they're so commonplace, wouldn't they have been contemplated and then negotiated and perhaps accounted for? Well, I think you can look at it two ways. One is that certainly because of the way the legislative scheme has been in place, you can't now start inserting restrictions or limitations without running afoul of just basic statutory construction arguments. I don't think it's the place for the courts to start inserting those types of instructions into legislation that don't exist and for which the Gaming Board has not responded in any negative way to try to undercut or try to block. This case isn't standing alone. This is the first case to reach the appellate court level. There are approximately 50 cases that are just like this pending at various circuit courts around the state. The only three that have been decided... They all involve BESC. Pardon me? They all involve BESC. No, they don't all involve BESC. Thank you, Jeff. I did want to respond to your question, Justice Langton, about whether BESC now, today, knowing that its license has been in fact denied and that denial has been final, whether they would be able to go out into the marketplace and enter into use groups. And of course, they wouldn't be able to do that, right? Because we have a decision, a judgment that they couldn't perform. I think that that's true. I wonder if we could parse that assignment a little bit.  But on an appeal, I assume an administrative appeal... I'll walk you across. There was that time period, that gap of time. That's a good question. I think it's very important that we make it clear because it is important. What the Gaming Board does is there is a sort of two-step process to this occurring. It will give you an initial sort of notice of its decision or notice of denial, which it did in this case. The operator, if it wants to challenge that initial sort of preliminary decision, can do so. And they file their request for a hearing with the Illinois Gaming Board. The rules are explicit in this area, which they say two things. Number one is that it is absolutely... that initial preliminary decision is not in any way final or binding until such time as your hearing has either been denied, your request for a hearing has either been denied, or until such time as you have a hearing and it gets litigated through the administrative process. Here, BEST did challenge that initial determination. But prior to the Gaming Board denying their request for a hearing, they made the assignment for TIDGEM. So on that day on which that assignment occurred, BEST remained an applicant under the Act for all purposes. And the decision with respect to its application had not been made, and certainly had not been made final, by the Illinois Gaming Board. And importantly, at that time, it was still possible, assuming that the initial decision had been overturned, for BEST to have performed its obligations under the agreement. What was the time period between the initial denial? It's short. And the date, I believe, is the end of June, when they received their initial denial, or mid to early part of July in 2012. And then this transaction occurred on July 17, 2012, and then the following day. And you don't understand what happens in that situation, too. You essentially have a fire sale of your assets when you go through that. You don't really have the time to fully vet and get the full market value for your assets. And that's just a consequence of the process. Jim bought all of it. It didn't buy all of it. It bought a certain block, or they call them grout, which is sort of a collection of geographically similar locations from BEST, that all sort of have some coherence. So they service them as a unit. Right, as a unit, as opposed to one-offs. So the implications in this case are, in our view, very severe. This is the first one that's up on the appellate court. There's a related case to this that you may be aware of, which is essentially, I think, 777 in some ways acknowledged that they didn't have standing to challenge the underlying document agreement between Jim and DeLees, and therefore initiated a lawsuit on behalf of DeLees against Jim. That case is also up on appeal in the third district here. The circuit court judge there had dismissed the complaint in its entirety. And then there's a third case that's down in the fifth district in St. Clair County, where the judge there similarly found that these pre-licensure agreements were perfectly valid. And my guess is that ultimately, once it gets to a point where it can be appealed, it will be. But we're blessed with the first one. Pardon me? We're blessed with the first one. Yes, Judge, you are. You have two minutes. Thank you very much. The ramifications are severe. There are thousands of these underlying agreements that are in existence. If this decision is anything other than supporting the decision of Judge Lannan, it will upset thousands of transactions. By the way, there are also hundreds, if not thousands, of video gaming terminals that are at locations pursuant to what initially was a precursor or pre-licensure agreement and now has elevated itself to a use agreement. So it throws into question whether those are valid. And then, of course, with the dozens and dozens of transactions where terminal operators bought the assets of others, it throws really into question the validity of those transactions as well. So a decision, anything other than affirming the dismissal, will really cause havoc, I think, within the industry. One argument that I wanted to address that was only first raised in the reply brief of the appellant is their argument that somehow the GEM contract or the Exclusive Placement Agreement violates the criminal code because in 777's position, it is a contract for the unlicensed conduct of video gaming. And that's absolutely contrary to the agreement itself. The agreement is explicitly conditioned upon licensure. It states, specifically in paragraphs 2 and paragraph 4 of the agreement, that each party must get the license before video gaming activity can be conducted. And it doesn't allow the installation of any video gaming terminals until after the licensing date, which is defined as the last date by which either of the two entities become licensed. You cannot, under any circumstances, conduct video gaming activity under the Exclusive Placement Agreement in an illegal way. And so the argument that 777 raises in its reply brief is not supported by the contract or the record. And frankly, it's an argument that wasn't raised until the reply brief. It's certainly not in the complaint, and it's not framed before the trial court. It's an argument that's been waived. And I think to get back, I think, Judge, to some of the concerns about unsavory folks benefiting from this, that it won't occur. There will not be a single video gaming terminal installed that's not licensed and pursuant to the act. At bottom, we ask that this court affirm the dismissal of the complaint. Thank you very much for your time. Thank you very much, Mr. Ramsey. And Mr. Riffle, any rebuttal? I want to really hone in on this whole issue of unsavory people benefiting from this, because I think that's really the heart of what we're saying here, and take issue with one thing that counsel said. These are not being sold at fire sale prices. There's irrational exuberance in the market. This is a market where everybody's scrambling to get market share. These denied applicants have been selling these for very, very large sums of money, and to say that the unsavory people aren't benefiting from this is simply wrong. And we can't have a rule that applies to one denied applicant because they had a footfall versus another who had numerous felonies. You have some very unsavory people that have tried to get into this business. You've got some very unsavory people who continue to try to get into this business, and this is a backdoor way for unsavory people to profit from this business. Are you talking about kickbacks from legitimate? Well, every aspect of it could happen, Your Honor, but there doesn't even have to be a kickback. They're selling contracts. Somebody comes up and says, I want a license. The IGB, Illinois Gaming Board, does an exhaustive search of their background, and they say, we're not going to give you a license because you have all of these problems in your background, be they felonies, be they associations with unsavory people. They're told you can't participate in this industry. And now what Jim is saying and others is that's okay because you've got this one-month period to go auction these off, and your parting gift as you get kicked out of the state or get kicked out of the industry is you get to profit from these. No secret, there are a lot of people that operated illegal so-called gray games or games that weren't appropriate. These are people in the industry that went out and signed out a whole bunch of their locations, and the IGB, serving the gatekeeping function, has said you can't have a license, you can't profit in this industry. And yet this cottage industry has arisen through what people are trying to create as a loophole to the regulatory scheme that these so-called precursor agreements are agreements that are ultimately going to allow somebody to place VGTs in a bar and that they have value. What about the fact that they submit in their application process this information about precursor agreements? Well... So they supply that information when they're requesting the license. As Council well knows, the IGB has not allowed that. They have not allowed that. In fact, the only statement in the record is Chairman Ostrowski's statement where he went to the trouble of knowing that this was all going on, and I quote, only licensed terminal operators and locations can actually enter into use agreements. So that's a use agreement, and the use agreement is pursuant to the act. It's not these preliminary agreements. Right, right. But a preliminary agreement, again, is just something made up. It's just something that nobody really had the right to go out and do because it violates the Illinois Gambling Law. It violates the Illinois Video Gaming Act itself because Section 5 and Section 25... Is it correct or not correct that the application mentions these pre-use agreements, the pre-agreements? The application requests copies of every contract you have with every material company. Which includes these pre-licensure agreements. It does, it does. So they are getting that information? Yes, yes. And our view on that is that that is just information that is certainly secondary to the language of the act, certainly secondary to the regulations. It isn't the force of law. This isn't somebody that put together an application. That has to take second or third seat to the clearly defined regulatory scheme. But the regulators never stopped them from saying, oh, wait a minute, that's prohibited information. But they never said they could either. They have taken a position, they have not come out and taken a position one way or the other. They're watching what's happening in the court as closely as anybody. I agree with Mr. Ramsey. This is a case of huge importance to the industry. We would respectfully submit the exact opposite of what Mr. Ramsey said. It would wreak havoc to allow this to go on because, again, anybody, and respectfully, I think even best under their argument to go out and continue to sign up more contracts. Just because they haven't been granted a license or been denied a license doesn't prevent them, under their theory, from continuing to sign up these precursor agreements. For those reasons, we respectfully request reversal. Thank you very much. Thank you, Mr. Ricketts. Thank you both for your arguments today. We will take this matter under advisement and get back to you with a written disposition within a short time. We will now take a short break. We will recess until tomorrow morning at 9 o'clock.